888 A.2d 758

Barbara GARDNER,

v.

## WORKERS' COMPENSATION APPEAL BOARD (GENESIS HEALTH VENTURES), Appellee

Appeal of Genesis Health Ventures

Wal–Mart Stores, Inc.,

v.

Workers' Compensation Appeal Board (Leroy Rider),

Appeal of Leroy Rider.

Supreme Court of Pennsylvania.

Argued Dec. 2, 2004.

Decided Dec. 28, 2005.

Ralph D. Oyler, for Leroy Rider.

Amber M. Kenger, Richard C. Lengler, Harrisburg, for Workers' Compensation Appeal Board.

Anthony T. Colangelo, Pittsburgh, for Wal–Mart Stores, Inc.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Chief Justice CAPPY.

These cases, consolidated for purposes of this appeal, require us to resolve issues dealing with the timing of when an insurer is required to request that an injured employee submit to an impairment rating evaluation ("IRE") for the purpose of obtaining an automatic reduction in benefits under the Workers' Compensation Act, 77 P.S. § 511.2 ("Act").[1]  For the

---

1. Generally speaking, when an employee has received total disability compensation for 104 weeks, unless otherwise agreed to, the employee will be required to submit to a medical examination for the purpose of determining the degree of impairment due to the compensable injury, if any.  If such a determination results in an impairment rating that is equal to or greater than fifty percent impairment, the employee will be presumed to be totally disabled and will continue to receive total disability compensation benefits.  However, if such determination results in an impairment rating of less than fifty percent, the employee will then receive partial disability benefits after proper notice.  21A Summ Pa. Jur. 2d, *Employment & Labor Relations* § 17:11 (2004)(citing 72 P.S. §§ 511–511.2).  The IRE procedure "was part of the General Assembly's 1996 reform effort intended to reduce rising Workers' Compensation costs and restore efficiency to the Workers' Compensation system." *Hilyer v. Workers' Compensation Appeal Board (Joseph T.*

following reasons, we affirm the Commonwealth Court's decision in *Gardner v. Workers' Compensation Appeal Board (Genesis Health Ventures)*, 814 A.2d 884 (Pa.Commw.Ct.2003)(*"Gardner"*) and reverse the Commonwealth Court's decision in *Wal–Mart Stores, Inc. v. Workers' Compensation Appeal Board (Rider)*, 837 A.2d 661 (Pa.Commw.Ct.2003)(*"Rider"*). A brief discussion of the facts and procedural history of each of these matters precedes our discussion of the legal issues involved.

The facts of *Gardner* were stipulated by the parties, and, thus, are not in dispute. Barbara Gardner ("Gardner") sustained a compensable work injury on October 2, 1996. As of October 2, 1998, she had received temporary total disability benefits for a total of 104 weeks. On June 13, 2001, Gardner's employer, Genesis Health Ventures ("Genesis"), requested that she submit to an IRE. Gardner objected to this request, claiming that the request was impermissible under 77 P.S. § 511.2(1), as it was not made within sixty days of her receipt of 104 weeks of temporary total disability benefits. Genesis, subsequent to Gardner's objection, filed a Petition for Physical Examination on August 10, 2001, requesting that a Workers' Compensation Judge ("WCJ") order Gardner to submit to an IRE. The WCJ, on November 2, 2001, denied the Petition based on Section 511.2(1),[2] which the WCJ found to require the insurer to request the IRE within the sixty-day period of Gardner's receipt of 104 weeks of temporary total benefits, which had commenced October 2, 1998. Genesis appealed the WCJ's decision to the Workers' Compensation Appeal Board ("WCAB"). On August 1, 2002, the WCAB reversed, based on its conclusion that 511.2(1) was ambiguous and that 34 Pa. Code § 123.102(f) properly interpreted that provision not as a statute of limitations, but rather as a "window in which the insurer must act for the 'adjustment of benefit status' 'to

*Pastrill, Jr. Logging)*, 847 A.2d 232, 235 (Pa.Commw.Ct.2004) (citation omitted).

2. We acknowledge that the parties cite this provision as "Section 306(a.2)(1)", in reference to its session law citation, 1915, June 2, P.L. 736, No. 338, art. III, § 306(a.2). For purposes of this opinion, however, all statutory citations will be to their Purdon's citation.

relate back to the expiration of the employee receipt of 104 weeks of total disability benefits.'" *See* WCAB Op. at p. 3. Gardner, in turn, appealed the WCAB's decision to the Commonwealth Court. In a published opinion, the Commonwealth Court *en banc* reversed the WCAB order, holding that the language of Section 511.2(1) is clear and free from ambiguity. As such, the Commonwealth Court held that an insurer must request that the claimant submit to a medical examination within sixty days of the claimant's receipt of 104 weeks of total disability benefits or be forever precluded from modifying the claimant's benefits based on the procedure set forth in 77 P.S. § 511.2. The Commonwealth Court specifically noted in *Gardner*, however, that an employer may, at any time, request that a claimant submit to a medical examination under 77 P.S. § 651 in order to modify a claimant's benefits based on a change in medical condition and earning power. *Gardner*, 814 A.2d at 887 n. 9. Genesis sought allowance of appeal, which we granted.

Turning now to the *Rider* matter, the facts and procedural history of that case are as follows: Appellee Wal–Mart Stores, Inc. ("Wal–Mart") had employed Leroy Rider ("Rider") as a truck driver since 1993. On July 31, 1998, Rider sustained a neck injury while in the course and scope of his employment. He underwent chiropractic therapy and treatment through his family physician. This course showed promise but was short-lived, as he was diagnosed with a ruptured cervical disc. Rider stopped working for Wal–Mart on October 21, 1998. He filed a Claim Petition on November 1, 1998, alleging total disability from October 21, 1998, and underwent corrective surgery on November 20, 1998. A WCJ, on December 16, 1999, found Rider's injuries to be work-related and awarded temporary total disability benefits from October 21, 1998. Wal–Mart appealed this decision to the WCAB and also requested a supersedeas order. On January 12, 2000, the WCAB granted Wal–Mart's supersedeas request *only* as to the payment of attorneys' fees for unreasonable contest and as to Rider's claim for disfiguring scarring. This order was unequivocal that "Supersedeas is denied in all other respects."

(WCAB Order of January 12, 2000) The WCAB remanded the case to the WCJ and, on November 20, 2001, the WCJ again found for Rider, awarding him total disability benefits from October 21, 1998. Wal–Mart did not contest this decision.

On December 10, 2001, 163 weeks after the date when disability benefits began, but within sixty days of the final adjudication of Rider's claim, Wal–Mart requested Rider submit to an IRE. On January 11, 2002, Wal–Mart informed Rider that his disability status, following the IRE,[3] changed from total to partial. Rider responded with a petition to reinstate his total disability status, alleging that Wal–Mart's IRE request was untimely under Section 511.2(1). The WCJ agreed with Rider, granting his reinstatement petition on June 28, 2002, on grounds that Wal–Mart's IRE request did not comply with the statute, as it was requested beyond the sixty days following Rider's receipt of 104 weeks of benefits. The 104–week period began, according to the WCJ, on the date of Rider's injury, October 21, 1998, and ended October 21, 2000. Wal–Mart thus had until December 20, 2000, to request that Rider submit to the IRE. Moreover, the WCJ concluded that the pertinent language of Section 511.2(1) is mandatory in requiring the insurer to request the IRE within sixty days upon expiration of the 104 weeks. Wal–Mart appealed that decision to the WCAB, which affirmed on May 12, 2003. A three-judge panel of the Commonwealth Court reversed the WCAB in a published decision. The *Rider* court distinguished itself from *Gardner* on the grounds that, unlike *Gardner*, the employer disputed Rider's entitlement to benefits. *Wal–Mart Stores, Inc.,* 837 A.2d at 664. Because Wal–Mart litigated Rider's claim, regardless of the amount of benefits Rider accrued, the *Rider* court held that he did not "receive" 104 weeks of total disability benefits until the WCJ rendered its decision on November 21, 2001. *Id.* Rider sought allowance of appeal, which we granted.

**3.** On January 8, 2002, Earl J. Wenner, Jr., D.O., conducted an IRE of Rider and concluded, in accord with the pertinent statute, that Rider had a 26 percent impairment.

Having discussed the factual and procedural backgrounds of the instant appeals, we turn now to an analysis of the parties' positions.[4] Each of the instant disputes centers on whether or not the insurers have met the timing requirements of Section 511.2 for the IRE to have an automatic effect on benefits. The dispute in *Gardner* looks to when the statute requires the insurer to make such an IRE request. On the other hand, the dispute in *Rider* relates to the when the prescribed 104–week period begins.

■ We note as an initial matter that the instant appeals require us to construe a portion of the Act. As in all cases involving the interpretation of a statute, we are guided by the provisions of the Statutory Construction Act. 1 Pa.C.S. § 1901 *et seq.* The most basic tenet of statutory construction is that a court must effectuate the intent of the General Assembly. 1 Pa.C.S. § 1921(a); *In re: Canvass of Absentee Ballots of Nov. 4, 2003 General Election,* 577 Pa. 231, 843 A.2d 1223, 1230 (2004); *Hannaberry HVAC v. Workers' Compensation Appeal Board (Snyder, Jr.),* 575 Pa.66, 834 A.2d 524, 531 (2003). We have stated that the best indication of legislative intent is the language of a statute. *Gilmour Mfg. Co.,* 822 A.2d at 679 (citation omitted). In addition, when a court is called upon to construe statutory language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage. . . ." *Id.* (quoting 1 Pa.C.S. § 1903). Further, when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S § 1921(b); *see also, In re: Canvass,* 843 A.2d at 1230 (citing *Scheipe v. Orlando,* 559 Pa. 112, 739 A.2d 475, 478 (1999)). "Where the words of a statute are clear and free from ambiguity, the legislative intent is to be gleaned from those very words." *Pennsylvania Financial Responsibility Assigned Claims*

4. The question before us involves the proper interpretation of a statute. This is a question of law and, thus, our standard of review is *de novo. Commonwealth v. Gilmour Mfg. Co.,* 573 Pa. 143, 822 A.2d 676, 679 (2003). Our scope of review, to the extent necessary to resolve the legal question before us, is plenary. *Buffalo Township v. Jones,* 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002).

*Plan v. English,* 541 Pa. 424, 664 A.2d 84, 87 (1995). *See also, Ramich v. Workers' Compensation Appeal Board (Schatz Electric, Inc.),* 564 Pa.656, 770 A.2d 318, 322 (2001). When the words of the statute are not explicit, the intention of General Assembly may be ascertained by considering the factors enumerated at 1 Pa.C.S. § 1921(c), including, *inter alia,* the occasion and necessity of the statute, the consequences of a particular interpretation, or administrative interpretations. 1 Pa.C.S. § 1921(c).

We begin our analysis, as we must, with the statutory terms at issue. The pertinent statutory section reads as follows:

When an employe has received total disability compensation pursuant to clause (a) for a period of one hundred four weeks, unless otherwise agreed to, the employe shall be required to submit to a medical examination which shall be requested by the insurer within sixty days upon the expiration of the one hundred four weeks to determine the degree of impairment due to the compensable injury, if any. The degree of impairment shall be determined based upon an evaluation by a physician who is licensed in this Commonwealth, who is certified by an American Board of Medical Specialties approved board or its osteopathic equivalent and who is active in clinical practice for at least twenty hours per week, chosen by agreement of the parties, or as designated by the department, pursuant to the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment."

77 P.S. § 511.2(1).

The next subsection in the statute dictates that, if the impairment rating produced in the evaluation process set forth in Section 511.2(1) is equal to or greater than fifty percent, the claimant is presumed to be totally disabled and will continue to receive total disability benefits. Should the outcome of the evaluation yield an impairment rating of less than fifty percent, the claimant's total disability benefits, upon sixty days' notice, are reduced automatically to partial disability benefits. 77 P.S. § 511.2(2).

In a subsequent section of the statute, the General Assembly provided:

Total disability shall continue until it is adjudicated or agreed under [77 P.S. § 512] that total disability has ceased or the employe's condition improves to an impairment rating that is less than fifty per centum of the degree of impairment defined under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment."

77 P.S. 511.2(5).

Finally, subsection 6 of the statute allows an insurer to request that a claimant undergo an impairment-related medical examination, providing:

Upon request of the insurer, the employe shall submit to an independent medical examination in accordance with the provisions of section 314 [77 P.S. § 651] to determine the status of impairment: Provided, however, That for purposes of this clause, the employe shall not be required to submit to more than two independent medical examinations under this clause during a twelve-month period.

77 P.S. § 511.2(6).

## I. *Rider*

Rider, the Appellant in that case, contends Section 511.2(1) is unambiguous and that the sixty-day window for Wal–Mart to request an IRE commenced on October 21, 2000, when he had "received" 104 weeks of disability benefits. According to Rider, the failure of Wal–Mart's insurer to request the IRE before December 20, 2000, the day the 104–week plus sixty-day window closed, made any subsequent request untimely. Rider asserts that the language of the statute does not provide that it shall or may be tolled while the underlying case is on appeal. No exceptions are found in this statute, and Rider declares that he did not engage in any conduct that would have misled Wal–Mart to inaction.

Wal–Mart, on the other hand, asks us to construe the meaning of "received" as it is used in Section 511.2(1) to include a tolling requirement that the claimant first be entitled

to the disability benefits that he or she received. Accordingly, Wal–Mart contends that the 104–week period in this matter did not start until the litigation ended and, for the second time, the WCJ awarded benefits to Rider on November 20, 2001. Based on this assertion, Wal–Mart suggests the sixty-day clock for requesting the IRE started 104 weeks after the WCJ's final adjudication on November 21, 2003, and ended on January 20, 2004. Wal–Mart argues that its request for Rider to submit to the IRE, as it came on December 10, 2001, was well before the lapse of the applicable period.

■ We cannot accept Wal–Mart's position with respect to when the time arises for making the IRE request for purposes of the automatic relief set forth in Section 511.2(2). First and foremost, Wal–Mart's argument is at odds with our statutory mandate to effectuate the intent of the General Assembly as evidenced by the language of the statute. 1 Pa.C.S. § 1921(a). Moreover, we are bound to construe words according to their common and approved usage. 1 Pa.C.S. § 1903. For purposes of resolving the *Rider* matter, the operative term of Section 511.2(1) is "received." The meaning of this term is significant, as receipt of 104 weeks of total disability benefits triggers the sixty-day countdown for the insurer to act in order to benefit from the *self-executing* procedure set forth in 77 P.S. § 511.2(1)-(2). The term "received," according to its common and approved usage, means acquisition or having come into possession.[5] Wal–Mart suggests a meaning for "received" that is not common and approved and on that basis, its position cannot stand. Thus, under the procedure for obtaining an automatic reduction in benefits in 77 P.S. § 511.2(2), the sixty-day window for an insurer to request an IRE under Section 511.2(1) begins once the employee has received, that is, acquired or comes into possession of 104 weeks of total disability benefits.[6] For these reasons, we must reverse the Commonwealth Court's decision in *Rider*.

**5.** The primary definition of the intransitive form of the verb "receive," is "[t]o acquire or get something; be a recipient." AMERICAN HERITAGE DICTIONARY, 2d College ed., 1032 (1981).

**6.** Moreover, Wal–Mart's assertion that its appeals tolled Rider's entitlement to benefits, stands in contrast to the longstanding principle that,

## II. *Gardner*

■ Our statutory analysis of Section 511.2(1), however, does not end at this point, as the issues presented in *Gardner* compel us to continue this undertaking. Just as in *Rider*, where the outcome turned on the term "received" in Section 511.2(1), the correspondingly critical word in Section 511.2(1) for the *Gardner* matter is the term "shall." As such, we are faced with the question of whether "shall," as written in a statute, is a mandatory or permissive term.

As may be suspected, the opponents in *Gardner* have taken up positions falling on both sides of the mandatory-permissive divide. Genesis, naturally, advocates that "shall" as it is used in Section 511.2(1) is permissive or directory. The foundation for Genesis' conclusion rests almost exclusively on the premise that Section 511.2(1) is ambiguous, as Genesis contends that "shall" can be mandatory only when the statute is unambiguous. Genesis makes these assertions despite its explicit concession that Section 511.2(1), "appears to state a hard and fast rule requiring insurers to request an IRE only within a specific sixty-day period." (Genesis' brief at p. 12). Genesis argues, however, that ambiguity obscures the otherwise clear words of Section 511.2(1) when that statute is read in conjunction with other subsections of Section 511.2 and other portions of the Act. For example, Genesis cites 77 P.S. § 511.2(6) as an instance in which the time for requesting the IRE is not defined, as is the case in Section 511.2(1), but, rather, open-ended. Genesis submits that, given the ambiguity as to when an insurer can request an IRE, there is no way that the General Assembly intended the insurer to be required to request the claimant submit to an IRE under 77 P.S. § 511.2 within sixty days of the claimant's receipt of 104 weeks of

absent a supersedeas, the burden remains on the employer to continue to pay compensation during the litigation period. *See McLaughlin v. Workers' Compensation Appeal Board (St. Francis Country House)*, 808 A.2d 285, 288–89 (Pa.Commw.Ct.2002). On December 15, 1999, the WCJ awarded benefits to Rider beginning October 21, 1998. Wal–Mart applied for supersedeas, but, on January 12, 2000, the WCAB denied Wal–Mart's request in all material respects; therefore, Wal–Mart's obligation remained constant and unchanging.

benefits. Genesis further argues that the General Assembly did not impose any sanction for failure of an insurer to comply with the sixty-day requirement in Section 511.2(1) and that this omission conveys the General Assembly's intent that "shall" is permissive or directory. Genesis also asserts that "shall" only is mandatory when the time and manner of something is of the essence, and that, with respect to Section 511.2(1), there is nothing suggestive of such urgency. Genesis urges us to defer to regulations promulgated by the Bureau of Workers' Compensation which resolve what Genesis terms is the "inherent ambiguity" of Section 511.2(1). Finally, Genesis avers that resort to legislative history and public policy considerations is necessary to resolve the quandary presented by Section 511.2(1)'s ambiguity. In sum, Genesis' view of the statute is that an insurer is entitled to make an IRE request beyond the time constraints set forth in Section 511.2(1), and still be entitled to the automatic relief under Section 511.2(2).

Gardner's position, simply stated, is that "shall" as it reads in Section 511.2(1) is mandatory. We find Genesis' arguments unpersuasive.

Notwithstanding the general rule that "shall" is mandatory, *Oberneder v. Link Computer Corp.*, 548 Pa. 201, 696 A.2d 148, 150 (1997), we are aware that the word "shall" also has been interpreted to mean "may" or as being merely directory, as opposed to mandatory. *Commonwealth v. Baker*, 547 Pa. 214, 690 A.2d 164, 167 (1997). *See also, Commonwealth ex rel. Bell v. Powell*, 249 Pa. 144, 94 A. 746, 748 (1915) (interpreting "shall" as "may"); *Fishkin v. Hi–Acres, Inc.*, 462 Pa. 309, 341 A.2d 95, 97–8 (1975)(interpreting "shall" to be merely directory as opposed to mandatory).

As stated above, we must construe the terms of a statute according to their common and approved usage. Given that this court has found "shall" to be susceptible to diametrically opposed interpretations, we cannot conclude that the term "shall," as it is used in Section 511.2(1), is so clear and free from all ambiguity that we can attach one or the other meaning without reservation. Fortunately, the General Assembly provided us with the necessary guidance to address

such a situation. When confronted with a statute whose terms are not explicit, 1 Pa.C.S. § 1921(c) permits us to ascertain the General Assembly's intent in drafting Section 511.2(1) by considering any one of a list of enumerated factors set forth in that statutory provision.

In our view, the General Assembly's intent in drafting Section 511.2(1) becomes manifest in consideration of the consequences of a contrary interpretation. 1 Pa.C.S. § 1921(c)(6). In this manner, we find it remarkable as a measure of the General Assembly's care and consideration in drafting Section 511.2(1) that the legislature chose to utilize the term "shall" no less than three times. Still more significant is that, in each of these three instances, the term "shall" correlates to an obligation imposed upon one of the three parties pertinent to the IRE process: first, the statute declares that the employee *"shall* be required submit to the IRE"; second, "a medical examination . . . *shall* be requested by the insurer" within a specified time; and third, "[t]he degree of impairment *shall* be determined . . . by a physician" according to specific criteria. Thus, the General Assembly addresses and imposes affirmative obligations upon not just one, but all three parties possessing indispensable roles in the IRE process. The obligations so imposed cannot be viewed in any other way but mandatory, as the success of the IRE process as a cost-containment measure depends on such. To construe the obligations imposed by Section 511.2(1) as merely directory, as opposed to mandatory, threatens to render the obligations, and, by extension, the process, meaningless. *See Canvass,* 843 A.2d at 1232. To adopt Genesis' approach, that is, to say "shall," as it relates to the insurer's obligation to request the IRE in the dictated manner is directory or permissive, frustrates the obligations which the very same statute, indeed, the very same sentence, imposes upon the employee and the physician. Stated another way, if we were to hold that the timeline for the insurer to request an employee submit to an IRE for the purpose of obtaining the relief afforded by Section 511.2(2) was merely directory, it is not unforeseeable that a claimant who has been requested to

submit to an IRE might be justified in declining to attend on the grounds that his or her obligation was but a mere suggestion. That scenario is not improbable either, as the results of an IRE could affect how long a claimant may receive benefits. The result of such a construction is absurd and would frustrate the cost-containment objectives of Section 511.2. Therefore, we cannot accept that one party's obligation is merely directory or permissive when the very same statute imposes corresponding obligations on others. In conclusion, the term "shall," as it is used in Section 511.2(1), imposes mandatory, and not directory or permissive, obligations when an insurer is seeking to obtain the automatic relief set forth in Section 511.2(2), i.e., a reduction from total to partial disability benefits pending notice based upon the outcome of the impairment rating evaluation.

■ This conclusion, however, does not end our task in construing Section 511.2, as the preceding analysis does not address Subsection 6, which also permits an insurer to request a claimant submit to a medical examination geared towards the impairment concept. Unlike Subsection 1, this subsection neither imposes time restrictions upon an insurer's ability to make the request,[7] nor does it provide for an automatic reduction of benefits based upon the impairment rating.[8] Rather, a reduction of compensation to partial disability when the examination occurs under Subsection 6 is governed by Subsection 5, which requires an adjudication or agreement under 77 P.S. § 512 before benefits may be modified, where "total disability or the employe's condition improves to an

7.  Section 314 sets forth the procedure by which an insurer can secure a physical examination or expert interview and specifies the procedure for compelling a claimant to comply with such a request. *See* 77 P.S. § 651(a). While the section also allows a claimant to have a health care provider of his choosing participate in the physical examination, it exempts examinations occurring under 77 P.S. 511.2(1) from this provision, instead indicating that such examination shall be conducted by a licensed physician meeting certain qualifications. *See* 77 P.S. § 651(b).

8.  Section 511.2(6) limits an employee from being required to submit to more than two examinations under this subsection during a twelve-month period.

impairment rating that is less than fifty per centum." 77 P.S. § 511.2(5).[9]

The General Assembly thus has supplemented the traditional approach for securing a reduction in benefits to partial disability by incorporating the concept of an IRE, providing for a self-executing, automatic modification of benefits where an insurer secures a dispositive impairment rating within a defined time period, under 77 P.S. § 511.2(1)-(2), and affording insurers the opportunity to establish an impairment rating in other time periods to reduce benefits via the traditional administrative process, under 77 P.S. § 511.2(5–6).

Genesis' claims that the General Assembly's failure to attach any express sanction on the failure to comply with the time requirements of Section 511.2(1) or suggest that time is of the essence in the IRE process serves no more than to draw attention away from the central issue, namely, that Section 511.2(1) imposes mandatory obligations upon the parties key to the IRE process as it relates to the self-executing portions of Section 511.2(2).

9. The Dissent fails to reconcile its interpretation of Subsection 7, 77 P.S. § 511.2(7) with Subsection 5, 77 P.S. § 511.2(5). Under its interpretation, Subsection 7 sets a strict and artificial limitation on the receipt of total disability benefits, whereas the clear and unambiguous terms of Subsection 5 mandate that total disability benefits shall continue until it is adjudicated or agreed that total disability has ceased or the claimant's impairment rating is less than fifty percent. The Dissent's view of Subsection 7 injects the mere passage of time as one of the triggers for the cessation of total disability benefits. Moreover, a crucial premise of the Dissent relies upon a factual determination, namely, the employers' "implicit agreement" to extend benefits in these matters, with no record citation to support such a finding. A finding of an agreement between an employer and claimant to extend benefits arguably would alter an employer's status, as an employer who has not made such an agreement would not have the benefit, under the Dissent's view, of the self-executing process for reducing benefits. To conclude, as the Dissent does, that the absence of an explicit agreement is tantamount to an implicit agreement could provide license to an employer to miss the deadlines of Subsection 1 and later claim an implicit agreement to extend benefits beyond 104 weeks which would allow the employer the benefit of the self-executing process for reducing benefits. Third, the Dissent fails to explain adequately how an agreement to extend benefits under its view of Subsection 7 translates into an agreement to extend the deadlines set forth in Subsection 1.

Genesis and Amici Pennsylvania Defense Institute ("PDI") and Pennsylvania Self–Insurers' Association ("PSIA") assert that we should reverse the Commonwealth Court's decision in *Gardner* in deference to the rulemaking authority of the Bureau of Workers' Compensation ("Bureau") and the rules it promulgated with regard to Section 511.2(1), specifically, 34 Pa.Code § 123.102.

■ "Although an interpretation of a statute by an administrative agency is entitled to great weight, the interpretation may be disregarded if the interpretation is clearly erroneous or inconsistent with the statute under which the regulation is promulgated." *Terminato v. Pennsylvania Nat'l Ins. Co.*, 538 Pa. 60, 645 A.2d 1287, 1293 (1994).

We are precluded from deferring to the Bureau's rulemaking authority in this instance because we find portions of the pertinent regulation, 34 Pa.Code § 123.102, to be inconsistent with Section 511.2(1). Subsection (a) of that rule states:

During the 60–day period subsequent to the expiration of the employee's receipt of 104 weeks of total disability benefits, the insurer may request the employe's attendance at an IRE. If the evaluation is scheduled to occur during this 60–day time period, the adjustment of the benefit status shall relate back to the expiration of the employee's receipt of 104 weeks of total disability benefits. In all other cases, the adjustment of the disability status shall be effective as of the date of the evaluation or as determined by the evaluating physician.

34 Pa.Code § 123.102(a). Subsection (f) of Section 123.102 states:

Consistent with section 306(a.2)(6) of the act (77 P.S. § 511.2), the insurer's failure to request the evaluation during the 60–day period subsequent to the expiration of the employee's receipt of 104 weeks of total disability benefits may not result in a waiver of the insurer's right to compel the employee's attendance at an IRE.

34 Pa.Code § 123.102(f).

Reviewing Rules 123.102(a) and (f) and the statute under which these provisions were promulgated, Section 511.2, we

find inconsistencies between statute and rule. Whereas in the statute, the General Assembly mandates the insurer to request the employee submit to the IRE for the purposes of obtaining the automatic relief in Section 511.2(2) within the sixty-day period, Rule 123.102(a), sets no time limits, providing that the "insurer may request the employe's attendance at an IRE." Similarly, Rule 123.102(f), which by its terms could abrogate the statutory mandate in the instance when an insurer seeks to obtain the automatic relief provided in Section 511.2(2), is inconsistent with Section 511.2(1). Consequently, we are not required to defer to the Bureau's interpretive rules and the arguments of Genesis and the Amici must fail. Rules 123.102(f), however, may be read to support our view that, under Section 511.2(6) an insurer may request an employee submit to an IRE beyond the sixty-day window; the consequences of such examination however, cannot operate to automatically reduce the claimant's benefits.

In conclusion, once a claimant receives, that is, comes into possession, of 104 weeks of total disability benefits, the insurer has sixty days from that date during which it must request that the claimant submit to an IRE for the purposes of obtaining the automatic relief set forth in 77 P.S. § 511.2(2). An insurer's failure to request an employee submit to an IRE within the proscribed time frames of Subsection 1, however, does not preclude an insurer from requesting that an employee submit to an IRE at a later time. As mentioned above, 77 P.S. § 511.2(6) permits an insurer to request the claimant submit to an IRE, the results of which are not, as in Section 511.2(2) self-executing, but rather, applicable to a traditional administrative process. For the aforementioned reasons, we affirm the Commonwealth Court's decision in *Gardner* to the extent that Genesis is precluded from seeking an IRE to obtain the automatic relief under Section 511.2(1)-(2) and we reverse the Commonwealth Court's decision in *Rider* to the extent that the IRE it obtained on January 8, 2002, could not be the basis for an automatic reduction in benefits and, therefore reinstate the decision of the Workers' Compensation Appeal Board granting Rider's reinstatement petition.

Justice CASTILLE, SAYLOR, EAKIN and BAER join the opinion.

Justice NIGRO files a concurring opinion.

Justice NEWMAN files a dissenting opinion.

Justice NIGRO, Concurring.

I agree with the majority's dispositions in both the *Gardner* and *Rider* cases. Moreover, specifically with respect to the *Gardner* case, I agree with the majority that an insurer must request an impairment rating evaluation ("IRE") within sixty days after an employee has received total disability compensation for a period of 104 weeks if the insurer wants to modify the employee's benefits pursuant to 77 P.S. §§ 511.2(1)-(2). I also agree that this interpretation of the statute is clear based on the General Assembly's use of the word "shall" when describing the manner in which an insurer must request an IRE. *See* 77 P.S. § 511.2(1). However, unlike the majority, I do not believe that the meaning of the word "shall" is ambiguous. Rather, in accordance with this Court's decision in *Oberneder v. Link Computer Corp.*, 548 Pa. 201, 696 A.2d 148 (1997), I believe that the word "shall" clearly means that something is mandatory. *See id.* at 204, 696 A.2d 148 ("By definition, "shall" is mandatory."). Thus, I see no need to look beyond the plain language of 77 P.S. § 511.2(1) to determine what the General Assembly meant by using the word "shall" in that statute. *See* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

Justice NEWMAN, Dissenting.

The Majority concludes that neither Barbara Gardner (Gardner) nor Leroy Rider (Rider) must submit themselves for an impairment rating evaluation (IRE) based on an interpretation of Section 306(a.2)(1) of the Workers' Compensation Act (Act),[1] 77 P.S. § 511.2(1), although the Majority would find

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 511.2(1).

that Gardner and Rider could be required to submit to an IRE pursuant to Section 306(a.2)(6). Because I believe that the Majority has reached an erroneous result in both matters before us, I must respectfully dissent.

The Act recognizes that the disability of an employee may change over time and accordingly permits modification, reinstatement, suspension, or termination of benefits based upon the degree of change in the employee's disability. In 1987, this Court issued its landmark decision in *Kachinski v. Workmen's Compensation Appeal Board (Vepco Construction Co.)*, 516 Pa.240, 532 A.2d 374 (1987), which outlined the steps necessary for a downward modification of benefits when the employee was found capable of gainful employment. In order to achieve that reduction in benefits, we stated that the employer must acquire a favorable opinion from a physician that the employee's medical condition has changed and that the employee is capable of returning to some degree of employment. Once the favorable opinion was obtained from the physician, the employer then had the burden of producing evidence of a referral to at least one open job in an occupation that the employee was medically cleared to perform. This became the standard and "[t]he resulting return-to-work scenarios devolved into fact-based challenges as to whether a claimant had received medical clearance; whether a claimant had, in good faith, followed up on the employer's referrals; and whether the employer met the technical requirements of a proper referral, such as age, education, training, experience, distance, medical restrictions, etc." *Caso v. Workers' Comp. Appeal Bd. (Sch. Dist. of Philadelphia)*, 576 Pa.287, 839 A.2d 219, 223 (2003) (Newman, J. concurring).

Subsequently, in 1996, the General Assembly enacted Act 57,[2] which made sweeping changes to the Act. Through Act 57, the General Assembly sought to reduce the cost of workers' compensation benefits within the Commonwealth, while maintaining benefits for those workers that were truly injured. If evidence establishes that the worker has regained some or all of his or her pre-injury earning capacity, benefits can be

2. Act of June 24, 1996, P.L. 350.

modified to reflect a decrease in physical disability. Thus, one of the new procedures chosen by the General Assembly, and one that has been successful among our sister states, is the IRE.

The General Assembly also chose to establish a strict and artificial limitation on the employee's receipt of total disability benefits. Substantively, and as established by the Act, an injured worker may not receive in excess of one hundred four weeks of total disability payments unless an impairment rating is established that exceeds fifty percent. 77 P.S. § 511.2(7).[3] Section 306(a.2)(1) mandates that, if an IRE has not been performed by agreement between the parties by the time that a claimant reaches one hundred four weeks of total disability benefits, then the insurer must request an IRE within sixty days of the one hundred four-week anniversary.[4] The statute says that the insurer "shall" make that request and I agree with the Majority that this requires mandatory action on the part of the insurer unless there is an agreement to the contrary.

However, I cannot agree with the Commonwealth Court, as affirmed by the Majority, that failure to obtain an IRE within the statutorily prescribed sixty-day window precludes all future IREs that would result in an automatic reduction in

3. That section states:

In no event shall the total number of weeks of partial disability exceed five hundred weeks for any injury or recurrence thereof, regardless of the changes in status in disability that may occur. In no event shall the total number of weeks of total disability exceed one hundred four weeks for any employe who does not meet a threshold impairment rating that is equal to or greater than fifty per centum impairment under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment" for any injury or recurrence thereof.

77 P.S. § 511.2(7).

4. That section states in pertinent part:

When an employe has received total disability compensation . . . for a period of one hundred four weeks (2 years), unless otherwise agreed to, the employe shall be required to submit to a medical examination which shall be requested by the insurer within sixty days upon the expiration of the one hundred four weeks to determine the degree of impairment due to the compensable injury, if any.

77 P.S. § 511.2(1).

benefits. There is simply no logical basis for a presumption that each and every work injury occurring in this Common-wealth will evolve over the course of one hundred four weeks to a level of recovery amenable to an impairment assessment. Neither is there any legislative indication that such a uniform approach was contemplated by Act 57.

The General Assembly chose not to provide a penalty for failure to secure the IRE by the one hundred four-week anniversary. Moreover, because the parties may agree to an IRE prior to the expiration of one hundred four weeks, and the employee is precluded from receiving total disability bene-fits that extend beyond one hundred four weeks (unless an impairment rating is established that exceeds fifty percent), I believe that the General Assembly permitted an agreement by the parties to extend benefits. In my opinion, this agreement must take place prior to the one hundred four-week anniversa-ry, either explicitly or implicitly. I conclude that this is the situation in the cases *sub judice.*

The employers here did not cease paying benefits after one hundred four weeks, although Section 306(a.2)(7) permits an employer to do so. Ergo, the parties have implicitly agreed that each claimant's impairment rating would exceed 50% at the one hundred four-week anniversary.[5] This enables total

5. The Majority believes that I neglected to reconcile subsection five and subsection seven. I fail to see the problem as both sections are clear and there is no conflict. Section 306(a.2)(5) is simply limited by the defined benefit period contained in Section 306(a.2)(7). I further believe that this limitation is an important aspect of the entire impair-ment rating evaluation scheme. With all due respect, the Majority fails to reconcile all subparts of Section 306(a.2). Nowhere in its analysis, does the Majority even discuss the effect of subsection seven on its interpretation of Section 306(a.2) and subsection seven is read com-pletely out of the statute.

The Majority critically comments that I did not explain "how an agreement to extend benefits under [my] view of Subsection 7 translates into an agreement to extend the deadlines set forth in Subsection 1." (Op. at 380 n. 9.) The simple answer to that is that Subsection 1 explicitly provides for an agreement between the parties. The text of Subsection 1 states in pertinent part:

When an employe has received total disability compensation ... for a period of one hundred four weeks (2 years), **unless otherwise agreed to,** the employe shall be required to submit to a medical examination

disability benefits to extend beyond the one hundred four-week anniversary and its sixty-day window until such time as an IRE is meaningful. It is also noteworthy that the General Assembly did not provide a mechanism by which a claimant can seek to secure an IRE when the employer has failed to act. This is significant because the claimant's total disability benefits must end after one hundred four weeks if neither an IRE nor an agreement is in place. 77 P.S. § 511.2(7). I am convinced that no such mechanism was provided because the parties, absent an explicit agreement, are deemed to have agreed that a claimant has an impairment rating in excess of 50%.

I find that the Act 57 amendments establish a new total disability scheme. Pursuant to that scheme, no claimant can receive more than one hundred four weeks of total disability benefits unless his or her degree of impairment exceeds 50%. 77 P.S. § 511.2(7). The claimant and the employer can agree on the timing of the IRE. A claimant may submit to an IRE voluntarily before the expiration of one hundred four weeks, but must submit to an IRE request made within sixty days of the one hundred four-week expiration. Where an employer fails to seek an IRE within the allotted timeframe, the employer has implicitly agreed that claimant's degree of impairment exceeds 50% and the claimant can continue to receive total disability benefits. Once an IRE is performed, additional IREs can be requested to establish the status of the impairment, but no more than two IREs can be sought in any twelve-month period. 77 P.S. § 511.2(6).

which shall be requested by the insurer within sixty days upon the expiration of the one hundred four weeks to determine the degree of impairment due to the compensable injury, if any.
77 P.S. § 511.2(1). The "unless otherwise agreed to" language, where the only limitation on the timing of any agreement is that it must occur before the expiration of one hundred four weeks, means that the parties can agree to have the IRE performed prior to or after the expiration of the one hundred four-week period and the employer still receives the benefit of the automatic modification provision. Claimants also benefit by an agreement in that they may continue to receive total disability benefits after the expiration of one hundred four weeks. 77 P.S. § 511.2(7).

I cannot agree to a hypertechnical approach to the construction and application of Section 306(a.2), particularly in light of the provision of the General Assembly that permits the parties to deviate from those statutory requirements by agreement. I would find that Genesis Health Ventures implicitly agreed that Gardner was more than 50% impaired when she reached the one hundred four-week anniversary. Thus, Gardner's total disability benefits could continue beyond October 2, 1998, until Genesis sought an IRE. This Genesis did on June 13, 2001. Accordingly, I would find that Gardner must submit to an IRE pursuant to Section 306(a.2)(1) to establish the status of her impairment.

In applying this same approach to the facts in *Wal–Mart Stores,* I agree with the Majority that Wal–Mart was responsible for the payment of benefits during litigation. Even though liability remained in dispute until the Board affirmed the award of benefits by the WCJ, no supersedeas was in place and Wal–Mart paid benefits through and beyond the one hundred four-week anniversary. Again, I would find that, because Wal–Mart did not request an IRE within sixty days of the expiration of the one hundred four-week period, it implicitly agreed that Rider's impairment exceeded 50%. Hence, I would also find that Rider must submit to an IRE.

Based on the foregoing, I would reverse the Order of the Commonwealth Court in *Gardner v. Workers' Compensation Appeal Board (Genesis Health Ventures),* 814 A.2d 884 (Pa. Cmwlth.2003), and affirm the decision of the Commonwealth Court in *Wal–Mart Stores, Inc. v. Workers' Compensation Appeal Board (Rider),* 837 A.2d 661 (Pa.Cmwlth.2003), albeit on different grounds.